**NORTHWEST BANCORPORATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,**
Respondent.

No. 16774.

United States Court of Appeals
Eighth Circuit.

June 13, 1962.

Loring M. Staples, of Faegre & Benson, Minneapolis, Minn., for petitioner; Leonard O. Langer, of Faegre & Benson, Minneapolis, Minn., with him on the brief.

Pauline B. Heller, Attorney, Dept. of Justice, Washington, D. C., for respondents; William H. Orrick, Jr., Asst. Atty. Gen., Washington, D. C., and John G. Laughlin, Jr., Atty., Dept. of Justice, Washington, D. C., with her on the brief.

Horace R. Hansen, St. Paul, Minn., for Independent Bankers Ass'n; Hansen, Hazen & Lynch, St. Paul, Minn., on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

This is a petition for review of an order of the Board of Governors of the Federal Reserve System (hereinafter the Board) dated March 23, 1961, denying an application of Northwest Bancorporation, petitioner, to secure prior approval of petitioner's proposed acquisition of 80% or more of the 1500 outstanding shares of stock of the First National Bank of Pipestone, Minnesota (hereinafter the bank). Petitioner is a bank holding company as defined by the Bank Holding Company Act of 1956, 12 U.S.C.A. § 1841 et seq. (hereinafter the Act), such prior approval being required by § 3 of the Act, 12 U.S.C.A. § 1842(a).[1]

Petitioner's application contained facts and figures demonstrating petitioner's financial soundness and ability to manage the bank, coupled with its announced intention of improving service to the public, among other things by the erection of a new building. The application also stated additional reasons why the petitioner believed the proposed acquisition was in the public interest. It disclosed that the bank is a family institution with a majority of its shares closely held by the Feldman family. Mr. E. J. Feldman, presently managing the institution, is 80 years of age and desires to retire. The other members of the family and the heirs of the present management are in no position to take over control of the bank, the logical successor being Mr. Feldman's son, a doctor who is living in Bronxville, New York, and who has never been actively associated with the bank. Plans to sell the bank to its employees proved to be impractical. It was represented that the only apparent way to avoid liquidation and get the bank management into strong hands was a sale to petitioner, and that the family had approached petitioner on the subject, discussions had taken place, and an offer of

---

1. 12 U.S.C.A. § 1842(a) provides:

"It shall be unlawful except with the prior approval of the Board * * * (2) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; * * *."

purchase made subject to the approval of the Board of Governors.

In accordance with the provisions of the Act, petitioner filed its application with the Board. Upon receipt thereof, the Board notified the Comptroller of the Currency, as required by the Act.[2] By letter of June 29, 1960, to the Board the Comptroller of the Currency recommended approval of the application. Had the Comptroller *disapproved* the application, the petitioner would, in accordance with the Act, note 2, supra, have been entitled to a hearing as a matter of express right. At the conclusion thereof the Board would have been required to grant or deny the application "on the basis of the record made at such hearing." However, since the Comptroller approved the application, no hearing was had, although one was requested by petitioner. On September 15, 1960, the Board issued a Tentative Statement proposing to deny the application. The notice of the Board's tentative decision provided that any interested person could, not later than fifteen days after the publication of such notice in the Federal Register, file with the Board in writing any comments upon or objections to the Board's proposed actions. Petitioner responded thereto, filing with the Board its "Comments upon and Objections to Tentative Statement and Proposed Action of Board of Governors." It requested reconsideration by the Board and "If our statements of fact are questioned, that we be permitted to prove them; if the Board wishes, at a formal hearing before a trial examiner."

On October 12, 1960, the Board, by letter, informed petitioner that it would consider any additional information or arguments petitioner cared to submit, including statistical material, affidavits and memoranda of law. Therein the Board stated:

"Although the memorandum submitted appears to present no material facts or arguments not heretofore considered by the Board, it states that you are prepared to prove the contrary of asserted assumptions and conclusions contained in the Board's Tentative Statement. The Board will consider any further information or arguments submitted in support of either the factual assertions made in the memorandum or the interpretation of the statute urged therein, provided such information or arguments are submitted within a reasonable time not to exceed 30 days from the date of this letter.

"There appears to be no basis at the present time for conducting a hearing on the instant application. However, as above indicated, the Board will give consideration to any written material, including statistical . material, affidavits, or memoranda of law, that you may care to submit within the time above specified in support of the assertions of fact or law contained in the memorandum of October 4."

2. § 3(b) of the Act, 12 U.S.C.A. § 1842 (b), provides:

"Upon receiving from a company any application for approval under this section, the Board shall give notice to the Comptroller of the Currency, * * * and shall allow thirty days within which the views and recommendations of the Comptroller of the Currency * * * may be submitted. If the Comptroller of the Currency * * * disapproves the application in writing within said thirty days, the Board shall forthwith give written notice of that fact to the applicant. Within three days after giving such notice to the applicant, the Board shall notify in writing the applicant and the disapproving authority of the date for commencement of a hearing by it on such application. Any such hearing shall be commenced not less than ten nor more than thirty days after the Board has given written notice to the applicant of the action of the disapproving authority. The length of any such hearing shall be determined by the Board, but it shall afford all interested parties a reasonable opportunity to testify at such hearing. At the conclusion thereof, the Board shall by order grant or deny the application on the basis of the record made at such hearing."

In accordance therewith petitioner did submit additional written material in the form of affidavits, an analysis of a statistical survey, and argument of its legal counsel. In submitting such material to the Board, the petitioner stated:

"* * * We also again request a hearing in this matter if the Board still feels inclined to reject our application."

On March 23, 1961, the Board unanimously denied the application. It accompanied its order with a statement setting forth its findings and its reasons for the denial. On May 19, 1961, petitioner, pursuant to the provisions of the Act,[3] sought review by this court of the Board's order.

In asking for review by this court, it is the petitioner's contention (1) that the order is invalid because of the Board's failure to make adequate findings to support its conclusions; (2) that the order is arbitrary, capricious and an abuse of discretion, contrary to and unsupported by the evidence; (3) that the order is predicated upon an erroneous interpretation of § 3(c) of the Bank Holding Act of 1956; and (4) that the denial of a hearing was a violation of petitioner's constitutional rights.

In the enactment of the Bank Holding Company Act of 1956 the Congress specifically provided that before a bank holding company could directly or indirectly acquire through ownership or control more than 5% of the voting shares of a bank it must obtain approval of the Board. § 3(a) of the Act, 12 U.S.C.A. § 1842(a), supra. It left the responsibility of approving or disapproving such bank acquisitions by holding companies squarely with the Board. In each instance the Board has the duty to make a judgment as to the effect a proposed acquisition would have upon the convenience, needs and welfare of the communities and the area concerned, sound and adequate banking, the public interest, and the preservation of competition in the field of banking. Congress specifically set forth the factors which were to govern the Board in its determination to approve or disapprove the application. § 3(c) of the Act, 12 U.S.C.A. § 1842 (c), provides:

"In determining whether or not to approve any acquisition or merger or consolidation under this section, the Board shall take into consideration the following factors: (1) the financial history and condition of the company or companies and the banks concerned; (2) their prospects; (3) the character of their management; (4) the convenience, needs, and welfare of the communities and the area concerned; and (5) whether or not the effect of such acquisition or merger or consolidation would be to expand the size or extent of the bank holding company system involved beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking."

In consideration of the first two assignments of error, one, attacking the findings as inadequate and, two, charging that the order is arbitrary, an abuse of discretion and unsupported, we believe it expedient that the main portion of the Board's statement accompanying its order of denial be set forth in full.[4]

3. § 9 of the Act, 12 U.S.C.A. § 1848, as amended, provides:

"Any party aggrieved by an order of the Board under this chapter may obtain a review of such order in the United States Court of Appeals * * * by filing * * a petition praying that the order of the Board be set aside. * * * Upon the filing of such petition the court shall have jurisdiction to affirm, set aside, or modify the order of the Board and to require the Board to take such action with regard to the matter under review as the court deems proper. The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive."

4. Omitting introductory paragraphs, the Board's statement accompanying its order of denial follows:

"*The first four factors.*—The town of Pipestone, with a population of about 5,700, is located in southwestern Minnesota in a well-diversified farming area.

It must be conceded first that there is no dispute between the Board and petitioner as to the basic facts. The history and size of the petitioner, the num-

There are two banks in Pipestone, The First National Bank of Pipestone, the subject of this application, with deposits of about $7.5 million, and the Pipestone National Bank, with deposits of about $3.2 million. The latter bank is a subsidiary of First Bank Stock Corporation, which also is a bank holding company.

"With respect to the first three statutory factors, it appears that, as to both Northwest and Bank, their financial history and condition are satisfactory, their prospects are good, and their managements are competent. In connection with their prospects and managements, the Board has considered (1) that the two senior officers of Bank, because of their age, are contemplating retirement or a less active role in Bank's management; and (2) that the largest single stockholder of Bank, who may eventually become the majority stockholder, is a nonresident who is not engaged in the banking business, and that this fact might affect the continuance of Bank in its present status. However, these facts, in the Board's opinion, are not sufficient to impair the future prospects of Bank or to suggest that it will not continue to be competently managed.

"With respect to the effect of the proposed acquisition upon the convenience, needs, and welfare of the area concerned, it appears that Bank has consistently been a leading bank in the area and has adequately met its customers' banking needs. Northwest has indicated that it is committed to the construction of a more modern bank building and to other physical improvements if its acquisition of Bank is approved; and it is recognized that Northwest's acquisition of control might result in some expansion of Bank's services and facilities. However, these facts do not, in the Board's judgment, provide strong ground in themselves for approval of the application, since Bank already is adequately contributing toward fulfilling the needs of its community for banking services.

"*The fifth factor.*—As in nearly all cases arising under the Bank Holding Company Act, the most difficult determination relates to whether the particular acquisition would expand the holding company's system 'beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking.' This is a determination that cannot be made in accordance with any formula but must be based upon consideration of all the relevant facts in each case. In this case, the most relevant facts are the following.

"Northwest controls 77 banks in Minnesota, Iowa, Montana, Nebraska, North Dakota, South Dakota, and Wisconsin. Within Minnesota, Northwest controls 47 banks with aggregate deposits of over $1 billion. These banks account for 7.2 per cent of total commercial banking offices in the State and about 26 per cent of total deposits of commercial banks.

"In appraising the effect of the proposed acquisition upon banking competition, the Board has taken into consideration Northwest's representations as to the areas in which Bank's business originates. As indicated by a map submitted with the application, Bank's 'primary area,' from which it obtains about 73.2 per cent of its deposits of individuals, partnerships, and corporations ('IPC deposits'), comprises the town of Pipestone and an area within a radius of 7 miles from Pipestone; and Bank's 'secondary area,' from which it obtains the remainder of such deposits, consists of the area beyond the primary area but within a radius of somewhat less than 25 miles from Pipestone. However, additional information subsequently submitted by Northwest asserted that the Pipestone County—Rock County line, which runs east-to-west through the town of Jasper, is a natural southern boundary of Bank's secondary area even though it has a few customers beyond that line. On this basis, Bank's secondary area would consist of the area beyond the primary area but within a radius of somewhat less than 25 miles from Pipestone to the west, north and east and approximately 12 miles to the south.

"Northwest does not presently control any bank in Bank's primary and secondary service areas. Northwest's nearest banking subsidiary is the Rock County Bank in the town of Luverne (population about 4,200), approximately 25 miles south of Pipestone and 13 miles beyond the southern limit of Bank's secondary area as above described. A survey of customers of Bank and of the Rock County Bank, submitted by Northwest, indicates that there is practically no overlapping of the service areas of the two banks and that competition between them is negligible.

"It is necessary, however, in the light of the fifth statutory factor, to consider not only the extent to which Northwest's acquisition of Bank would immediately lessen competition but also how it may affect the future competitive position and

ber of banks it controls, the size of First Bank Stock Corporation, its banks and the locations thereof, the size and location of the First National Bank of Pipe-

growth of other banks in the areas involved.

"If Bank were to be acquired by Northwest, the holding company would control one of the two banks in Pipestone and approximately 72 per cent of the IPC deposits held by those banks. Within the primary and secondary areas of Bank, as previously described, there are 11 banks—9 in Minnesota and 2 in South Dakota. Bank is the largest of these banks. Its acquisition by Northwest would cause Northwest to control approximately 35 per cent of the aggregate IPC deposits held by the 9 Minnesota banks in those areas and nearly 28 per cent of such deposits held by all 11 of the banks in those areas.

"In this connection, Northwest has urged that, in determining the proportion of deposits that would be controlled by it if the acquisition were approved, consideration should be given to the deposits held by a large savings and loan association in Pipestone. However, for the reasons stated by the Board in its Statement regarding the application by First Bank Stock Corporation to acquire stock of Eastern Heights State Bank (1960 Bulletin 486, 492), it is the Board's opinion that, for purposes of the Bank Holding Company Act, 'competition in the field of banking' does not encompass whatever competition may be afforded by savings and loan associations.

"The full effect of the proposed acquisition upon the public interest and preservation of competition cannot, in the Board's opinion, be fairly determined without taking into account the fact that the other bank in Pipestone is a subsidiary of First Bank Stock Corporation, a bank holding company which controls 86 banks in 5 States, 49 of which, with aggregate deposits of about $1,202,550,-000, are in Minnesota.

"As indicated in the Board's Statement (1959 Bulletin 134) regarding the application of Firstamerica Corporation to acquire stock of California Bank, the Board does not regard the Holding Company Act as meaning that the mere size or extent of an applicant holding company's system should itself be regarded as an adverse consideration. Furthermore, the existence of a subsidiary bank of another holding company in the area in which an applicant holding company proposes to acquire a bank does not, of course, compel an adverse decision. The law requires the Board to consider whether a particular acquisition would expand the size or extent of 'the bank holding company system involved' beyond limits consistent with the public interest and preservation of competition. However, the strength of another holding company in the area concerned may, in circumstances like those in the present case, be directly relevant to the question whether the proposed particular acquisition by the applicant holding company would expand its system in a manner that would adversely affect potential banking competition in that area.

"The Board has recognized the adverse effect upon the public interest and preservation of competition that may follow from control of a large proportion of the banking resources of a community by relatively large bank holding companies. When Northwest sought to acquire a proposed new bank in Rochester, Minnesota, the Board noted that two of the three existing banks in Rochester were subsidiaries of Northwest and First Bank Stock Corporation, and that, if Northwest should establish a fourth bank in Rochester, three of the four banks would be subsidiaries of these holding companies, and Northwest, controlling two of these four, 'presumably would be in a strong position to increase its relative proportion of the banking business of the community.' (1958 Bulletin 11)

"In the present case, the two holding companies would control not only all of the deposits of banks in the town of Pipestone but also over 38 per cent of the aggregate IPC deposits of all banks in Bank's primary and secondary areas. This fact assumes greater significance because the bank proposed to be acquired by Northwest is the largest bank in these areas. Although the town of Luverne is 13 miles beyond the limits of Bank's secondary area, it is also significant that of the two banks in Luverne one is a subsidiary of Northwest and the other is a subsidiary of First Bank Stock Corporation. Moreover, as indicative of the strength of the two holding companies in the general area, it may be noted that, while there are 40 Minnesota banks within a radius of 50 miles of Pipestone, only 14 of these have deposits of more than $3 million. Of these larger banks, the two holding companies now control 9 and, if the proposed acquisition were consummated, they would control 10 of the 14 larger banks in the general area.

"It is recognized that there would remain within Bank's primary and secondary areas a number of alternative

stone, the number of banks in Pipestone and in its primary, secondary, and general areas—these are all basic facts about which there is no dispute, nor can there be.

Summarized, they present the following picture: (1) That petitioner controls 77 banks in a seven-state area. Within Minnesota it controls 47 banks with aggregate deposits of over one billion dollars. It controls 26% of the total deposits of commercial banks in Minnesota. (2) If the acquisition of bank were approved, petitioner would control 72% of the IPC (individual, partnership and corporation) deposits in Pipestone; it would control 35% of the IPC deposits of the Minnesota banks in the primary

and secondary areas served by bank; and 28% of the IPC deposits of all banks (nine in Minnesota and two in South Dakota) in the areas concerned. (3) There is only one other bank in Pipestone. It is a subsidiary of First Bank Stock Corporation, a bank holding corporation which controls 86 banks in five states, 49 of which, with aggregate deposits of about $1,202,550,000, are in Minnesota. If the proposed acquisition of bank were approved, all of the banking resources of Pipestone, Minnesota, would be controlled by relatively large holding companies; and 38% of all IPC deposits of all banks in the primary and secondary areas concerned would be controlled by holding companies. (4) The bank proposed to be acquired is the

sources of banking services, including banks not controlled by a holding company. However, all of these banks are smaller than the bank proposed to be acquired by Northwest. In these circumstances, it is the Board's judgment that Northwest's acquisition of the largest bank in the areas involved would have an adverse effect upon the general competitive situation.

"What has been said here should not be construed, as applicant appears to construe it, as meaning that banks controlled by one holding company do not actively compete with banks controlled by another holding company operating in the same area. To the extent that such competition between banks in different holding company groups exists and may be intensified, this is not, of course, inconsistent with the preservation of banking competition as contemplated by the Act. But the fifth statutory factor is not limited to the preservation of competition between holding company banks; it requires the Board to consider the whole field of banking competition, including the possible adverse effect of the expansion of bank holding company groups upon the competitive position of the banks in the area concerned that are not controlled by holding companies.

"Nor should any statements here made be construed as suggesting that the expansion of a bank holding company in an area in which another holding company operates would be regarded by the Board in all cases as having an equally adverse effect upon banking competition. As previously indicated, the Board's decision must depend upon all the facts of

each case. Thus, in an earlier case involving Northwest (1959 Bulletin 147), the Board approved an application to acquire a bank in Eveleth, Minnesota, despite the fact that it caused Northwest and First Bank Stock Corporation to control three of the five banks in the vicinity, since that adverse circumstance, in the Board's opinion, was outweighed by considerations favorable to the proposed acquisition. By contrast, in the present case it appears to the Board that the benefits that may result from the proposed acquisition are not sufficient to offset its adverse effect upon the public interest and preservation of competition.

"*Conclusion.*—It was the Board's tentative decision, notice of which was duly published in the Federal Register on September 22, 1960 (25 FR 9129) that approval of the proposed acquisition would not be consistent with the public interest or the purposes of the Bank Holding Company Act and that the application should be denied. As contemplated by that notice, affidavits and arguments were submitted by Northwest and other comments were submitted. All such affidavits, arguments and comments have been carefully considered by the Board and, to the extent necessary, consideration thereof has been reflected in this Statement.

"Viewing the relevant facts in the light of the general purposes of the Act and the factors enumerated in Section 3 (c), it is the judgment of the Board that the proposed acquisition would not be consistent with the statutory objectives and the public interest and that the application should be denied. March 23, 1961."

largest bank in the area concerned. Its deposits are more than double those of the other bank in Pipestone. (5) Thirteen miles beyond the bank's secondary area, in the town of Luverne, Minnesota, there are two banks, one of which is owned by petitioner and the other by the First Bank Stock Corporation. (6) Within a radius of fifty miles of Pipestone are 40 Minnesota banks, of which only 14 have deposits of over $3,000,000. Of these 14, 9 are controlled by the two holding companies (petitioner and First Bank Stock Corporation); and if the acquisition were approved 10 would be so controlled.

As to the first three statutory factors to be considered in passing on petitioner's application, the Board found the financial history and condition of petitioner and bank to be satisfactory, their prospects good and their managements competent. It gave consideration to the bank management situation, the fact that the one who would eventually become the majority stockholder was a non-resident not engaged in the banking business, and that this fact might affect the continuance of the bank in its present status. It concluded, however, that such facts were "not sufficient to impair the future prospects of Bank or to suggest that it will not continue to be competently managed." With respect to the fourth factor, the Board found that the bank had consistently been a leading bank in the area and had adequately met its customers' banking needs, contributing toward the convenience and welfare of the community and the area concerned. It considered petitioner's proposals with reference to physical improvements, expansion of services and facilities, but found that in its judgment they did not provide sufficient ground for approval of the application "since Bank already is adequately contributing toward fulfilling the needs of its community for banking services."

With reference to the fifth factor, and after considering the undisputed basic facts, all of which had been presented in petitioner's application and in its supporting data, and after weighing the arguments submitted by petitioner's counsel, it was the Board's judgment *"that the benefits that may result from the proposed acquisition are not sufficient to offset its adverse effect upon the public interest and preservation of competition"* and *"it is the judgment of the Board that the proposed acquisition would not be consistent with the statutory objectives and the public interest and that the application should be denied."* (Emphasis supplied.)

We think it may not be gainsaid that concentration of control has the natural and inherent effect of lessening competition. See Judge Dawson's observations in American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y., 1957, 152 F.Supp. 387, 396, affirmed 2 Cir., 1958, 259 F.2d 524. Control of all banks in one ownership would have the natural effect of lessening competition in the industry. This would likewise tend to be true but to a lesser degree where the concentration of control of all banks is in the hands of two ownerships. The ratio of course, continues. This does not necessarily mean, however, that all acquisitions are deleterious or that all acquisitions must have the effect of lessening competition in the banking field. It does mean that under the fifth factor the requested acquisition should be weighed for its effect on "adequate and sound banking, the public interest, and the preservation of competition". This is reflected in the legislative history of the Act. See Senate Report No. 1095 on S. 2577, 84th Congress, 2nd Session, 1956, U. S. Code Congressional & Administrative News, pp. 2482, 2491–2492:

> "It is upon the basis of these factors [the five factors set forth in Section 1842(c)] that the Federal Reserve Board is to measure whether each application should be granted or denied in the public interest. It will be noted that these factors extend beyond the nature of those primary in importance to bank supervisory authorities in the exercise of their

supervisory powers. In most instances, safety of the depositor's funds and adequate banking service to the public in the area where the bank operates are uppermost in the consideration of such bank supervisory authorities. *The factors required to be taken into consideration by the Federal Reserve Board under this bill also require contemplation of the prevention of undue concentration of control in the banking field to the detriment of public interest and the encouragement of competition in banking.* It is the lack of any effective requirement of this nature in present Federal laws which has led your committee to the conviction that legislation such as that contained in this bill is needed. Under its provisions, the expansion of bank holding companies in the banking field would not be prohibited, but would be regulated in the public interest." (Emphasis supplied.)

It could well be that the Board could find adequate and sound basis for approval of an acquisition in order to strengthen an institution or for other reasons. Note the Board's statement, supra. Here, however, the Board found that the acquisition by petitioner of the largest and most active bank in the Pipestone area would concentrate control and might reasonably be calculated to reduce competition. In doing so, it considered the fact that the only other bank in Pipestone was owned by the First Bank Stock Corporation, another bank holding company. Such fact did not, of course, force the conclusion that the acquisition of bank by petitioner would have an adverse effect upon competition and the public interest, nor did it foreclose such conclusion. It was a factor to be considered by the Board in making its judgment and weighing the probable adverse effect upon competition against the suggested improvements in physical plant, facilities and services or any other factor which might tend to make the acquisition beneficial from the public standpoint.

In contending that the Board reached the wrong conclusion, petitioner states in its brief:

"Between these admitted facts and the Board's ultimate conclusion—between the starting point and the destination—there is no designated connecting highway. Petitioner explored this uncharted area and found that the road led to an entirely different destination; that competition would be enhanced rather than adversely affected by the proposed acquisition."

Where either one of two inferences may reasonably be drawn from undisputed facts, the inference adopted by the agency or board whose duty it is to draw the inference from which it is to formulate its judgment may not be disturbed on appeal. Radio Officers' Union v. N.L.R.B., 1954, 347 U.S. 17, 48–49, 74 S.Ct. 323, 98 L.Ed. 455; Corn Products Refining Co. v. F. T. C., 1945, 324 U.S. 726, 739, 742, 65 S.Ct. 961, 89 L.Ed. 1320; N.L.R.B. v. Nevada Consolidated Copper Corp., 1942, 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305; N.L.R.B. v. Des Moines Foods, Inc., 8 Cir., 1961, 296 F.2d 285, 289. See discussion in 4 Davis, Administrative Law Treatise, § 29.05.

The drawing of an inference and the making of a judgment based thereon, particularly in this kind of case where the question is whether the acquisition of bank by petitioner will, in the future, adversely affect the public interest and lessen competition in the field of banking, necessarily requires the making of a prophecy. Here that prophecy has been made. The Board, upon whose special competency Congress relied in delegating the authority to approve or disapprove bank acquisitions by holding companies, concluded that in the overall picture the public interest would be adversely affected and competition would be lessened by the acquisition. Through use of the same facts petitioner finds that by the acquisition competition would be enhanced and the public welfare unim-

paired. This is no more than a disagreement with the Board's conclusion. The responsibility of making the determination was vested by Congress with the Board and its conclusion must prevail.

■ This court, no matter what its economic views might be, no matter what it might determine to be good or bad banking, or what it might think the effect such acquisition might have on sound banking, the public interest or competition in the field of banking, may not substitute its findings and its judgment for the findings and judgment of the Board, provided, of course, the findings of the Board as to the facts are supported by substantial evidence. § 9 of the Act, 12 U.S.C.A. § 1848, as amended. Where basic facts are not in dispute, it is then particularly true that the Board here, or a like governmental agency under similar situations, brings to bear its experience and its particular expert judgment. Radio Officers' Union v. N.L.R.B., supra, 347 U.S. at 49, 74 S.Ct. at 340; Securities & Exchange Commission v. Chenery Corp., 1947, 332 U.S. 194, 207–209, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995; Board of Governors v. Agnew, 1947, 329 U.S. 441 (concurring opinion by Mr. Justice Rutledge at 449–451), 67 S.Ct. 411, 91 L.Ed. 408; Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 800, 65 S.Ct. 982, 89 L.Ed. 1372; N.L.R.B. v. Link-Belt Co., 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; cf. I.C.C. v. J-T Transfer Co., Inc., 1961, 368 U.S. 81, 93, 82 S.Ct. 204, 212, 216, 7 L.Ed.2d 147. The statement of the Supreme Court in Securities & Exchange Commission v. Chenery, supra, 332 U.S. at 209, 67 S.Ct. at 1583 is a guide to the judicial function as it applies to review of the actions of an administrative agency:

"The Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts. It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. See Republic Aviation Corp. v. [National] Labor [Relations] Board, 324 U.S. 793, 800 [65 S.Ct. 982, 89 L.Ed. 1372]. *Whether we agree or disagree with the result reached, it is an allowable judgment which we cannot disturb.*" (Emphasis supplied.)

See Gray v. Powell, 1941, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301; Fahey v. O'Melveny & Myers, 9 Cir., 1952, 200 F.2d 420, 472–474, certiorari denied Mallonee v. Fahey, 345 U.S. 952, 73 S.Ct. 863, 97 L.Ed. 1374.

The argument, made orally by counsel for the petitioner, to the effect that the present decision of the Board results in giving a competitor holding company "a vested interest in a town" is not persuasive. It may well be that in this particular instance the Board's decision has that effect. If so, however, it is merely happenstance. There is indicated no policy of the Board to that effect nor do we find one. The argument, if carried further, could be used by a third holding company demanding equal ownerships in size or number in this or other towns or cities.

A careful consideration of the Board's decision and the record convinces us that the findings are not inadequate, that they are supported by substantial and undisputed evidence, are not arbitrary, capricious or an abuse of discretion, as contended by petitioner, and are therefore conclusive.

■ Under its third assignment of error petitioner contends that "the order is to a large degree predicated upon an erroneous interpretation of § 3(c) of the Act [12 U.S.C.A. § 1842(c)]." It argues, first, that under § 3(c) (5), 12 U.S.C.A. § 1842(c)(5), there are three separate factors for consideration, "adequate and sound banking, the public interest, and

preservation of competition." It claims the Board ignored the first factor, overlooking "the obvious question whether it is consistent with adequate and sound banking to let the First National Bank of Pipestone be liquidated or fall into weak hands". It further claims that the Board sought to define "public interest" as synonymous with "preservation of competition" and in doing so overlooked the fact that it would not be in the public interest for the bank to be liquidated or fall into weak hands. As to each contention, it is a mere matter of disagreement with the Board's conclusion. We are convinced from the Board's statement that it gave adequate consideration to petitioner's contentions but did not agree with petitioner's conclusions.

Petitioner further finds two "misinterpretations" inherent in the Board's reasoning. It claims the "misinterpretations" to be first, that mere bigness by itself is ground for denial and, second, that other holding companies doing business in the area should be considered. It contends such interpretations to be erroneous and to require this court's setting aside the Board's order.

The Board makes no assertion that mere bigness by itself justifies denial of the application. It expressly repudiates such view. Note Board's statement, supra. Nevertheless, size and concentration of bank control in the area is indeed a factor which was and should have been considered by the Board in weighing the advisability of approving the acquisition and its effect upon adequate and sound banking, the public interest and the preservation of competition. Certainly the size of petitioner as well as that of bank are factors which contribute to the whole picture from which the Board had to make its determination.

As to the second alleged misinterpretation, we think the Board was on sound ground in considering holding company strength in the area and the fact that if the acquisition here should be approved, then the only two banks in Pipestone would be controlled by holding companies, petitioner herein and First Bank Stock Corporation. In making its determination with reference to "the convenience, needs, and welfare of the communities and the area concerned" and the effect of such acquisition on "adequate and sound banking, the public interest, and the preservation of competition * * *", the Board had to view the structure of the entire industry of banking and could not limit its consideration to the petitioner and bank alone. Cf. American Crystal Sugar Co. v. Cuban-American Sugar Co., supra, 152 F.Supp. at 396. Petitioner's contention that because § 3(c), 12 U.S.C.A. § 1842(c), refers to "the bank holding system involved", the Board's consideration must be limited to petitioner alone cannot be maintained. To exclude from consideration the existence of other holding companies and their banks doing business in the area would be to force the Board to act more or less in a vacuum. Realities must be recognized. Petitioner's interpretation would leave the statutory direction without substantial meaning and prevent the Board from the consideration of vital facts in making its judgment. We hold that the order was not predicated upon an erroneous interpretation of the Act.

Petitioner's final contention is that Board's denial of a hearing is a denial of due process. It directs attention to the Administrative Procedure Act, 5 U.S.C.A. § 1004. It should be noted, however, that such section providing for procedural rules relative to hearings says, "In every case of adjudication *required by statute to be determined on the record after opportunity for an agency hearing, * * *.*" (Emphasis supplied.) As has already been noted, the statute does not require a hearing unless the Comptroller of the Currency "disapproves the application in writing." § 3(b) of the Act, 12 U.S.C.A. § 1842(b). Here the Comptroller approved and accordingly no statutory provision for a hearing exists. Had the Congress desired a hearing under these circumstances, we think it would have so provided. We may not

read into the omission thereof legislative desire or intent for a hearing. As stated in Fahey v. O'Melveny & Myers, supra, 200 F.2d at 477:

"* * * it is sufficient to point out that Congress has carefully refrained from writing into the Act [Federal Home Loan Bank Act, 12 U.S.C.A. § 1421 et seq.] a provision requiring the holding of Board hearings on final administrative orders even when such a hearing may be demanded or requested, and this omission is too significant to be overlooked or disregarded. For this court to now hold that a requirement for such hearings on orders of the character here involved must be read into the Act 'as an integral part' of the legislation because such orders are *charged* with being the product of arbitrary and capricious impulses and motivated by malice, we would be inserting a requirement in that Act which is not only conspicuous by its absence but the insertion of which would amount to judicial amendment of language which speaks the continued legislative will and policy of Congress in a manner too plain to be misunderstood."

Additionally, it may be pointed out that the legislative history regarding the particular provisions of the Act with which we are here concerned indicates that Congress intended no hearing if the Comptroller (or State Bank supervisory authority) expressed no written disapproval. See Senate Rep.No.1095 on S. 2577, 84th Congress, 2nd Session, 1956, U.S.Code Congressional and Administrative News, pp. 2482, 2490.

"* * * It affords the bank supervisory authorities an opportunity to file with the Federal Reserve Board a formal recommendation that the application be denied. But it also provides that if such a recommendation is made, the Federal Reserve Board must provide a hearing of record after due notice at which the testimony of all in-terested parties may be received, including, of course, the applicant and the disapproving bank supervisory authority. * * *

"This procedure, it appears to your committee, should afford opportunity for developing the true merits of an application upon due consideration of the facts, in instances where the bank supervisory authority involved expresses written disapproval of the application. It also assures adequate recourse to court proceedings for an aggrieved party.

"*At the same time, it leaves the Federal Reserve Board free to proceed in a more informal manner in handling an application as to which the appropriate bank supervisory authority expresses no written disapproval.*" (Emphasis supplied.)

Professor Davis, in his most comprehensive work, 1 Davis, Administrative Law Treatise, § 4.04, pp. 247–248, states:

"Probably the outstanding example in the federal government of regulation of an entire industry through methods of supervision, and almost entirely without formal adjudication, is the regulation of national banks. * * * The system may be one of the most successful, if not the most successful.

*       *       *       *       *       *

"The striking fact is that whereas the nonbanking agencies administer their systems of requiring licenses and approvals by conducting formal adjudications in most cases involving controversies, the banking agencies use methods of informal supervision, almost always without formal adjudication, even for the determination of controversies. The contrast is a striking one with respect to each parallel problem; for instance, the problem of the extent of community need is about the same whether the application is for establishment of a bank, a television station, or an airline, and yet the prob-

lem is handled in the banking field by the methods of the business man and in the other fields by the methods of the judge in his courtroom."

In connection with the request for hearing, it should also be noted that following the filing of the original application petitioner was given every opportunity to submit to the Board whatever facts, data, theory or argument it desired. Petitioner failed in this proceeding to direct attention to any facts not presented to the Board or overlooked by it. Apparently petitioner presented everything it had. We conclude that the Board gave full consideration thereto. Under such circumstances, the holding of a hearing would have been an unnecessary proceeding and would obviously have availed nothing. See Dyestuffs & Chem., Inc. v. Flemming, 8 Cir., 1959, 271 F.2d 281, 286–287, and cases discussed therein. We conclude that there was no error in denial of petitioner's request for formal hearing.

The Board's action is in all things affirmed.