The **MARINE CORPORATION,**
Petitioner,

v.

The **BOARD OF GOVERNORS OF** the
**FEDERAL RESERVE SYSTEM,**
Respondent.

No. 14122.

United States Court of Appeals
Seventh Circuit.

Dec. 17, 1963.

Roger C. Minahan, Robert D. LeMense, Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for petitioner.

Morton Hollander, Chief, Appellate Section, Pauline B. Heller, Attorney, U. S. Department of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., for respondent.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Petitioner, The Marine Corporation, a Wisconsin bank holding company located in Milwaukee, applied to the Board of Governors of the Federal Reserve System, pursuant to the Bank Holding Act of 1956, 12 U.S.C. §§ 1841–1848, for prior approval of petitioner's acquisition of eighty per cent or more of the voting shares of The Beloit State Bank, Beloit, Wisconsin, a state bank.

In accordance with the provisions of section 3(b) of the act, 12 U.S.C. § 1842 (b), the Board requested the recommendation of the Commissioner of Banks for the State of Wisconsin. The Commissioner as well as the United States Department of Justice filed statements with the Board opposing the application.

Pursuant to the requirements of the act, the Board held a public hearing on the application before a hearing examiner in accordance with the Board's Rules of Practice for Formal Hearings (12 C.F.R. § 263). Thereafter, the hearing examiner issued a report in which he recommended that the application be approved. Subsequently, on January 31, 1963, the Board, one member dissenting, rejected the examiner's report and denied approval of the application. The petition for review followed, under the provisions of section 9 of the act, 12 U.S.C. § 1848.

Petitioner contends that the Board failed to provide findings of fact and reasons to support its conclusion that the approval of petitioner's application would have an adverse effect upon competition in the Beloit banking area and in the State of Wisconsin; that the denial of the application was arbitrary and capricious; and that the Board's order was not supported by substantial evidence.

In First Wisconsin Bankshares Corp. v. Board of Governors, 7 Cir., 325 F.2d 946, a similar contention was made by Bankshares. There we announced the applicable standard of review of the Board's findings. We also set forth the statutory factors that the Board must consider, under section 3(c) of the act, 12 U.S.C. § 1842(c), in granting or denying prior approval of an application by a bank holding company to acquire control of a bank. Accordingly, we think

it unnecessary to repeat the standard or the five statutory factors.[1]

■ Upon an examination of the record before us and after applying the standard of review stated in Bankshares, we conclude that the Board's denial of the instant application was neither arbitrary nor capricious and that its order has substantial support in the record when considered as a whole.

For reasons similar to those stated in Bankshares, we do not undertake a recitation or an analysis of the primary evidentiary facts. Rather, we think the facts referred to in the Board's opinion [2] and the inferences which the Board drew

---

1. We are mindful of the strictures placed upon the substantial evidence rule when a hearing examiner has made findings contrary to those of the administrative agency. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951). Those strictures must be kept in mind in appraising the record here.

2. Omitting introductory paragraphs, the Board's statement accompanying its order of denial of the application follows: "Application of the Marine Corporation, Milwaukee, Wisconsin, for Approval of Acquisition of Shares of the Beloit State Bank, Beloit, Wisconsin.

"Financial history and condition.—Applicant began operations as a bank holding company on December 31, 1958, and at the present time controls 10 banks operating in the State of Wisconsin. These banks, together with their deposits as of March 26, 1962,[1] are as follows:
1. Unless otherwise indicated, all figures used herein are of this date.
Marine National Exchange Bank, Milwaukee ($173 million); Wisconsin Marine Bank, Milwaukee ($32 million); Security State Bank, Madison ($21 million);[2] Na-
2. This bank was acquired by Applicant on June 29, 1962, and all figures herein have been adjusted, where necessary, to reflect this acquisition.
tional Manufacturers Bank of Neenah ($18 million); Peoples Trust and Savings Bank, Green Bay ($17 million); Capitol Marine Bank, Milwaukee ($15 million); Cudahy Marine Bank, Cudahy ($14 million); South Milwaukee Marine Bank, South Milwaukee ($9.3 million); Waukesha County Marine Bank, Pewaukee ($9.2 million); and Oak Creek Marine National Bank, Oak Creek ($1.3 million). In addition, the Board has given its approval to Applicant's acquisition of Waukesha Marine National Bank, Waukesha (a new bank, not yet open). In terms of total deposits, Applicant is the third largest of the holding companies headquartered in the State of Wisconsin, and (as of December 31, 1961) the fifteenth largest in the United States.

"Since Applicant's principal assets are the stocks of its subsidiary banks, the condition of those banks is the principal factor bearing on the financial condition of Applicant. Total deposits and capital accounts of Applicant's subsidiary banks are $308 million and $29 million, respectively, and on the basis of all available information the financial condition of these banks appears to be satisfactory. Accordingly, the Board finds, as did the Hearing Examiner, that Applicant's financial history and condition are satisfactory.

"Beloit State was organized and began operations in 1892 and has shown a relatively consistent pattern of growth. Deposits have increased six-fold since 1940. Since 1955 this deposit growth has been largely in time deposits; from year-end 1955 to March 26, 1962, while total deposits were increasing from $24 million to $34 million, demand deposits actually declined slightly (by $300 thousand), a situation which appears attributable, in large part, to a decline in large commercial and industrial demand accounts. Beloit State has loans of $16 million and total assets of $38 million. From December 31, 1956, to March 26, 1962, Beloit State's capital accounts increased from $2 million to $2.9 million from retained earnings and its reserve for bad debts increased from $258 thousand to $656 thousand. The Hearing Examiner found, and the Board agrees, that the financial history and condition of Beloit State are satisfactory.

"Prospects.—The prospects of Applicant are intimately related to the prospects of its subsidiary banks. Each present subsidiary is located in a prosperous and growing area of the State. Six of these subsidiaries are located in Milwaukee County: Marine National Exchange Bank, located in downtown Milwaukee, is the third largest bank in the City and State; Capitol Marine Bank is located in the northeast section of Milwaukee in a prosperous business, industrial, and residential area; South Milwaukee Marine Bank is located in South Milwaukee, a growing suburb of the City of Milwaukee; Cudahy Marine Bank is located in Cudahy, another suburb of Mil-

waukee, which has experienced substantial population growth and industrial development in the last decade; Wisconsin Marine Bank has experienced a striking recent growth and is located in a section of the south side of the City of Milwaukee which is being redeveloped; and Oak Creek Marine Bank is located in a growing community in the southeastern corner of Milwaukee County with its service area bounded on the north by the city limits of Milwaukee. The Waukesha County Marine Bank, Pewaukee, is located in the county to the west of Milwaukee County, and its head office is approximately 20 miles west and somewhat north of the downtown business district of the City of Milwaukee. Peoples Trust and Savings Bank is located in downtown Green Bay, a prosperous community located approximately 115 miles north of Milwaukee. The National Manufacturers Bank of Neenah, the second largest bank in the cities of Neenah and Menasha, is located approximately 70 miles northwest of Milwaukee in Winnebago County. The recently acquired Security State Bank is located in a rapidly growing trade area on the east side of the city of Madison, 77 miles west of Milwaukee in Dane County. The Waukesha Marine National Bank, when opened, will be located in downtown Waukesha, 18 miles west of the downtown business district of Milwaukee. Each of these banks appears to have good prospects, and therefore the Board concludes, as did the Hearing Examiner, that the prospects of Applicant are satisfactory.

"So far as concerns Beloit State, Applicant expresses the view that the prospects for continued growth and expansion and development of its services are good if it can meet the challenge arising from the expansion of its primary trade area and the increasing competition from banks in the large metropolitan centers for the credit and deposit business of the principal industrial concerns in its primary trade area. This latter point was the subject of considerable attention and emphasis, both in the application and during the course of the hearing, and, in the final analysis, may be characterized as the primary consideration upon which Applicant seeks to justify the proposed acquisition.

"It is possible, as contended by Applicant, that if Beloit State were to become affiliated with Applicant's holding company system, some of the credit and service requirements of the large industrial concerns in the Beloit area might be more readily accommodated locally, and that this, in turn, might enable Beloit State to recapture some of the loan and deposit business of these firms which has migrated to the large financial centers such as Chicago and New York. Assuming, without conceding, the correctness of Applicant's assertion that a major portion of the recaptured deposits could be expected to remain with Beloit State and be utilized in the Beloit area, nevertheless this is only one of the economic considerations which has a bearing on the prospects of Beloit State. The City of Beloit is in the center of an area which has demonstrated a vigorous upward trend in population and business over the past two decades, and according to a population study prepared for the Beloit City Planning Commission in March 1962, there is every indication that this trend will continue. Based on Beloit State's pattern of growth to date and taking into account its dynamic management, it appears reasonable to conclude that it will capture a fair share of the new banking activity inherent in the expansion of population and business in the vicinity of Beloit, and that effective steps will be taken by Bank to keep pace with the demand from the community at large for new and improved banking services. The Hearing Examiner found Beloit State's prospects to be good and, in the Board's opinion, this would be true whether or not it is affiliated with Applicant, although its prospects would probably be bettered to some degree by consummation of the proposed acquisition.

"Management.—Applicant has 21 directors; 15 are officers and/or directors of Marine National Exchange Bank, including its president, 3 are presidents of other subsidiary banks (Cudahy Marine Bank, National Manufacturers Bank of Neenah, and Wisconsin Marine Bank), 1 is a director of Oak Creek Marine National Bank, and only 2 have no official relationship with Applicant's subsidiaries. Applicant's officers are drawn predominantly from the ranks of officers of Marine National Exchange Bank, Applicant's largest subsidiary. Collectively, these directors and officers represent considerable knowledge and experience in the field of banking, and in the Board's opinion the character of Applicant's management is satisfactory. This is in accord with the finding of the Hearing Examiner.

"Applicant states that the present management of Beloit State is competent, and all indications support this comment. Its Board of Directors includes the President of Beloit College and the presidents of four large local manufacturing concerns,

which gives Bank access to a pool of mature and thoughtful business judgment. Beloit State's officers are relatively young and appear to be able and aggressive. In the light of the foregoing, the Board is of the view that the character of Bank's management is satisfactory, which is consistent with the Hearing Examiner's finding that management is 'apparently outstanding.'

"Applicant claims, however, that notwithstanding the present quality of Beloit State's management, Bank is finding it increasingly difficult to fill management vacancies and attract adequate personnel, and that this situation bodes ill for the future unless access is had to the pool of experienced personnel in Applicant's system. Certainly this contention merits careful consideration by the Board. However, the record shows that during the past five years Beloit State has been able to find and employ five capable executives. Viewed in perspective, there is no indication that Beloit State's problems with regard to management succession and replacement differ markedly from those facing the banking industry in general or, more particularly, other banks of similar size and operating circumstances. Thus, while it is recognized that staffing problems might be solved more readily as a member of a holding company system, the Board cannot conclude that affiliation with Applicant is the only reasonable means of insuring continued vitality and competence in Bank's management ranks, and therefore does not regard this consideration as weighing significantly in favor of approval of the application.

"Convenience, needs, and welfare of the communities and the area concerned.— Beloit State's only office is located in the City of Beloit, Rock County, Wisconsin, which is immediately north of the Illinois-Wisconsin border, 107 miles northwest of Chicago, 73 miles southwest of Milwaukee, 48 miles southeast of Madison, and 13 miles south of Janesville. Bank's primary service area encompasses all of the City of Beloit and almost all of the Town of Beloit and the Town of Turtle; the estimated population of this area, as of the date of the application, was 45,541.

"Besides Beloit State, with deposits of $34 million, there are two other banks in the City of Beloit—the First National Bank and Trust Company and the Beloit Savings Bank (an insured mutual savings bank), having deposits of $20 million and $14 million, respectively. All three banks are located within a block of each other.

"Rock County had a population of 113,913 at the time of the 1960 census, representing a 22.8 percent increase over the preceding 10 years. In addition to the 3 Beloit banks, there are 13 other banks in the County. Beloit State is the largest of these 16 banks, followed by Merchants & Savings Bank, Janesville (deposits $21 million), First National Bank & Trust Company, Beloit (deposits $20 million), First National Bank of Janesville (deposits $16 million), and Beloit Savings Bank (deposits $14 million). The 11 remaining Rock County banks range in deposits from $9.2 million down to $1.2 million.

"According to Applicant, the trade area served by Beloit State would benefit in the following ways from approval of the proposed acquisition;

"(a) Bank would be able to maintain and add to its experienced staff, both on the management level and in the various service areas, thereby bringing to the area a degree of specialization in banking services which is now lacking.

"(b) Bank would be better able to compete with the large metropolitan banks in serving the large industrial concerns located in its primary service area, both in terms of credit demands and with respect to highly specialized counsel such as in the field of foreign trade, thereby attracting larger deposit balances from these firms which would increase the strength of Bank and enhance its growth, leading to improvement in the financial strength and stability of the community. A collateral consideration also advanced is that local availability of the necessary banking services could attract new concerns to the Beloit area and encourage existing firms to expand operations in Beloit rather than elsewhere.

"(c) Bank would be better able to develop its installment loan business, a service for which there is great potential in the Beloit area.

"(d) Bank would be able to provide better trust and investment services, particularly in the field of corporate fiduciary operations.

"In addition to the foregoing, it is claimed that affiliation with Applicant would give Beloit State access to improved operational features such as automation, portfolio management and analysis, system and procedure studies, participation in joint advertising programs, credit investigation and review, centralized purchasing, personnel training and development, coordinated fringe benefit administration, and coverage in group insurance policies; also, that new capital

would be more readily available when required. Presumably, it is Applicant's position that these incidental advantages of Bank's affiliation would redound to the benefit of the individuals and businesses in the Beloit area by making Bank stronger and more efficient, thereby enabling it better to serve its customers.

"With respect to the circumstances bearing on the fourth statutory factor, the Hearing Examiner concluded that—

" 'On the basis of the evidence presented the program would appear to be in the public interest, in that it would contribute to the convenience, needs, and welfare of the community and the area concerned and introduce desirable competitive forces within the affected banking structure. It would seem reasonable to conclude that strengthening a local financial institution so as to enable it to serve local needs with greater adequacy, and thus to compete more effectively with out-of-area banks for area business should provide a broader competitive base, and consequent better service, and thus further the legitimate interests of the local community. In this sense the tendency of the result would appear to be to diffuse and to moderate existing concentration of banking power and resources. It would thus seem that unless there are substantial countervailing considerations the application should be approved. * * *'.

"Although agreeing in principle with the conclusion of the Hearing Examiner concerning the favorable impact of the circumstances bearing on the fourth statutory factor in this case, the Board does not regard the evidence relating thereto as being quite so persuasive.

"There is no evidence of record to indicate that there are banking needs within Beloit State's service area which are presently unserved. Nor would it appear that the welfare of the community would be materially affected by consummation of the proposed transaction.

"Applicant asserts its belief that should Beloit State become affiliated with Applicant's holding company system, a substantial portion of the large business concerns in and around Beloit would thereafter utilize Bank's service to a greater extent, resulting in Bank's acquiring some of the deposits of these businesses now held by banks in Chicago, Milwaukee, and New York. While it appears equally likely that a substantial part of any such deposits moving to Beloit State from the banks in the large financial centers might in fact be transferred to other sub-sidiaries of Applicant, principally Marine National Exchange Bank, to the extent that Applicant's management found it advantageous to leave these deposits in Beloit State, there could be, as Applicant argues, some positive influence on the economy of the Beloit area. However, former customers attracted back to Beloit State by the larger loan and service potential of the holding company system may well be borrowers as well as depositors, and it may be questioned whether their additions to the local pool of loanable funds (through recaptured deposits) would exceed their drains upon the local pool of loanable funds (through repatriated loans).

"To be sure, the management of the holding company system and that of its larger customers may arrange the distribution of loans, deposits, and services through the holding company system in any desired fashion that conforms to legal limitations. Nevertheless, the long-run incentives for management to make such distribution in ways which enlarge the net lending potential of Beloit State will arise out of the useful services available through Bank and profitable opportunities for investment in the area which it serves. With regard to this point, there is no indication in the evidence before the Board of a relatively profitable unsatisfied margin of local credit demands in the Beloit area, nor are there signs that the growth of the Beloit area has been or will be hampered by reason of inadequate bank credit. Thus, there can be no firm reason to believe that the proposed acquisition would have a significant impact in this respect on the welfare of Beloit and environs.

"So far as concerns the convenience of banking services in Beloit, the record supports the conclusion that the general banking requirements of the majority of Beloit's residents are adequately and conveniently served by the local banks, and that the principal beneficiaries, in terms of convenience, of the proposed acquisition would be the few large business enterprises in the Beloit area which might benefit from having a local conduit for counsel and services of a highly specialized nature, such as foreign trade and corporate fiduciary activities, as well as from having an augmented supply of credit available through a local source.

"Certainly Bank's desire to accommodate this segment of the business community as well as the public at large is a legitimate and laudable objective, and it appears in the present case, whatever the usual situation with regard to cor-

respondent relationships may be, that Beloit State has found resort to its correspondent banks for credit and service assistance unsatisfactory, compounding the difficulties which it has faced and foresees in aspiring to the patronage of the large businesses in the Beloit area. Possibly Beloit State could, by diligent search, find a correspondent or correspondents which would be willing to engage in a viable and mutually satisfactory working relationship.[3] By the same token, in light

> 3. It may well be that this has already been accomplished, since shortly before the public hearing Marine National Exchange Bank in Milwaukee, the largest bank in Applicant's holding company system, became Beloit State's principal correspondent.

of Beloit State's past history and the enterprising character of its present management, it might reasonably be expected to take necessary action to broaden its services. However, the fact of the matter is that were the proposed affiliation to take place it is reasonable to predict that Beloit State might well be in a position better to meet at least part of the banking requirements of the firms in question, and the local availability of this alternative source of service could reasonably be regarded as representing a greater convenience to such firms. Thus, while the circumstances surrounding the application here under consideration which have a bearing on the statutory factor of convenience, needs, and welfare of the community and area involved resolve themselves into a question primarily of the convenience of Beloit State's present and potential customers, and in this regard the issue is one essentially of the convenience of the large industrial concerns in Bank's service area, the Board regards the contribution to the convenience of this important segment of the community as weighing, although not heavily, in favor of approval of the application.

"Effect on adequate and sound banking, the public interest, and competition.—The fifth statutory factor which the Board is directed to consider is whether the proposed acquisition would expand the size or extent of the holding company system involved beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking.

"As pointed out by the Board in the Morgan New York State Corporation case (1962 Federal Reserve Bulletin (May) pp. 579 et seq.), while each of the statu-

tory factors is important and no single one controlling, in evaluating the weight and significance of the various considerations which are found to exist with respect to a given proposal the Board must bear in mind the over-all purposes of the statute. The legislative history of the Act reveals that a principal impetus for its enactment was the belief of the Congress that there was need for regulatory control over affiliations of banks through the holding company device because, uncontrolled, such activity could lead to undue concentration of banking resources and activities as well as restraint or inhibition of competition.

"The first point to be considered in relation to this factor is the effect of the proposed acquisition in this case upon the size and extent of Applicant's holding company system.

"Applicant, with its 10 operating subsidiary banks having 12 banking offices in the State of Wisconsin and controlling $308 million in deposits,[4] ranks as the

> 4. Excludes the Marine National Bank of Waukesha, acquisition of which has been approved by the Board but which is not yet open for business, but includes Security State Bank, Madison, which was acquired on June 29, 1962.

third largest bank holding company headquartered in Wisconsin and (as of December 31, 1961) the fifteenth largest (out of 46) in the United States. Although only a bit over one-third (36%) as large as the largest Wisconsin holding company in terms of deposits, if the deposits of the principal bank in each system are deducted from the ratio, Applicant is almost three-quarters (73%) the size of the largest.

"If this application were to be approved, the aggregate deposits of applicant's subsidiaries would increase to $343 million and its banking offices to 13. This would make Applicant the second largest Wisconsin holding company in terms of total deposits. The proposed acquisition would give Applicant representation in six Wisconsin counties.

"Beloit State (the largest bank in the City of Beloit and in Rock County) has deposits of $34 million and operates one banking office, which represents 50.7 per cent and 25.0 per cent, respectively, of the deposits and banking offices in the City of Beloit and 23.2 per cent and 5.9 per cent, respectively, of the deposits and banking offices in Rock County.[5]

> 5. Data includes deposits of $14 million and one office of a mutual savings bank in Beloit.

"There is no indication that consummation of the acquisition here under consideration would be inconsistent with adequate and sound banking, either in Beloit or elsewhere. However, the impact of the acquisition upon the preservation of competition in the field of banking, and, more broadly, the public interest, deserves close attention.

"Applicant claims that the proposed acquisition would not result in any adverse effect upon banking competition in the Beloit area. Apart from the fact that none of Applicant's present subsidiary banks is located in or does any significant amount of business in Beloit State's primary service area, it is suggested that the present pattern of competition between Beloit State and the two other local banking institutions would not be disturbed, because the objective and effect of the proposed acquisition would be to strengthen Beloit State's ability to compete with large metropolitan banks for the business of large corporate clients in the Beloit area, which neither of the other local banks is in a position to seek. Indeed, it is argued, the competitive picture of banking in the community will actually be enhanced, since by affiliation with Applicant Beloit State will be better able to service the banking demands of the large local businesses, thereby bringing to the community a new alternative source of banking. This line of argument was found persuasive by the Hearing Examiner, and he concluded that 'there is no apparent reason to apprehend that affiliation of the Bank with Applicant will adversely alter existing competitive relationships as between the Beloit Banks.' The Board does not agree.

"It may well be that the proposed transaction would, through the benefits of direct affiliation with the third largest Wisconsin bank holding company (which would become second if the application were to be approved), serve to place Beloit State in a position to compete more vigorously with other banks in Chicago, New York, and elsewhere. On balance, however, it may be questioned whether, in fact, the impact of Beloit State's enhanced competitive strength could be or would be channeled only into the recapture of business now handled by the large metropolitan banks; many of the improved and expanded services which Applicant claims will be instituted by Beloit State following affiliation would, perforce, redound to the benefit of the Bank in serving not only large corporate clients but the public at large.

"The Board is not unmindful of the evidence adduced which purports to show that independent banks in certain Wisconsin communities have flourished in the face of competition with a local bank holding company subsidiary. However, there is nothing to indicate that, as applied to the Beloit area, the nature of the banks involved or the economic, demographic, or geographic circumstances are comparable; nor is it clear as to what the explanation for this phenomenon is or the extent to which it may be true in other locations. In this posture of the record, the Board does not feel at liberty to infer that Beloit State's affiliation with Applicant would not place the other banks in Beloit and, to a lesser extent, in Rock County at a disadvantage in competing with Bank for business.

"It is the opinion of the Board that consummation of the proposed acquisition would increase the local market dominance of what is already the largest bank in the City of Beloit and in Rock County, thereby having a potential long-range detrimental competitive effect on the remaining smaller independent banks located therein, and this negative consideration is sufficient to outweigh the favorable circumstances found to exist with respect to the first four statutory factors in this case and to call for disapproval of the application.

"A further aspect of the competitive question to which consideration has been given is the effect which consummation of the proposed acquisition would have on the concentration of banking resources in the State of Wisconsin.

"The three largest Wisconsin bank holding companies together account for 42 offices (5.8 per cent) and 31.7 per cent and 34.2 per cent, respectively, of the deposits and loans of the insured commercial banks in the State; and if this application were to be approved, these three holding companies would control 6.0 per cent of the commercial banking offices in Wisconsin, and 32.4 per cent and 35.0 per cent, respectively, of the deposits and loans of these offices. The Hearing Examiner concluded that Applicant's acquisition of Beloit State would not tend to monopoly control of banking in the State of Wisconsin. While this may be true, the Board's responsibility under the Act requires it to consider more than the question of monopoly control.

"Perhaps, viewed in the abstract, the extent to which Beloit State's acquisition would add to the total commercial bank-

968

therefrom in denying the application demonstrate that the Board considered all the evidentiary facts in relation to the five statutory factors, and that its ultimate findings have reasonable and substantial support.

The Board found that the financial history and condition of both petitioner and Beloit State are satisfactory. It also found that their prospects are good.

The management of petitioner and of the bank is, according to the Board, satisfactory. This finding supports petitioner's assertion that the management of Beloit State is competent. Petitioner claims, however, that the bank is finding it increasingly difficult to adequately replace management vacancies. We think the Board was justified in concluding that, "while it is recognized that staffing problems might be solved more readily as a member of a holding company system, the Board cannot conclude that affiliation with Applicant is the only reasonable means of insuring continued vitality and competence in Bank's management ranks, and therefore does not regard this consideration as weighing significantly in favor of approval of the application."

As to the factor—convenience, needs, and welfare of the area concerned—the Board concluded that the proposed acquisition would contribute to the needs of large local business concerns by their more extensive use of the bank services,

and that this weighed, "although not heavily, in favor of the application." We think the Board's guarded conclusion is based upon reasonable factual inferences.

Thus, it is seen that the Board concluded that its findings covering the first four factors set forth in section 3(c) favored the approval of the application. It held, however, that the fifth statutory factor—the effect on adequate and sound banking, the public interest, and the preservation of competition—prevented approval of the application. It concluded that petitioner's acquisition of Beloit State "would be inimical to the preservation of competition in the field of banking and contrary to the public interest" and further that "the consummation of the proposed acquisition would increase the local market dominance of what is already the largest bank in the City of Beloit and in Rock County, thereby having a potential long-range detrimental competitive effect on the remaining smaller independent banks located therein, and this negative consideration is sufficient to outweigh the favorable circumstances found to exist with respect to the first four statutory factors in this case and to call for disapproval of the application."

The question before us, then, is whether these foregoing conclusions have substantial evidentiary support either of a direct or inferential nature.

ing offices and deposits under holding company control in the State or in the County involved would not be considered substantial. However, since the three largest bank holding companies in Wisconsin already control a significant portion of the deposit and loan business of banks in the State, under circumstances such as those here presented, where one of the large holding companies proposes to add the largest bank in a trade area (indeed, Beloit State ranks 17th in amount of deposits in the State) to an already significant pattern of control of banking resources by the large holding companies in the State, the Board would consider itself remiss in its statutory duties were it to grant approval without

the most clear-cut showing of countervailing benefits.

"Conclusion.—All things considered, it is the conclusion of the Board that, taking into account the present dominant position of Beloit State in its trade area and the existing degree of control of banking resources by the three large holding companies in the State of Wisconsin, Applicant's acquisition of Bank would be inimical to the preservation of competition in the field of banking and contrary to the public interest. This adverse consideration is not sufficiently offset, in the Board's judgment, by favorable considerations under other statutory factors as to warrant approval of the application."

The Board listed the following important facts relevant to the fifth factor.[3] Petitioner has ten operating banks in Wisconsin and is the third largest bank holding company in the State; if the application were to be approved, petitioner would become the second largest Wisconsin holding company in terms of total deposits; Beloit State is the largest bank in the City of Beloit and in Rock County; and its deposits represent over fifty per cent of the deposits in the City of Beloit and over twenty-three per cent in the county.

From the basic factual data, which are not in dispute, the Board could reasonably conclude that the proposed acquisition would increase the dominance of Beloit State, already the largest bank in the Rock County area; that this increased dominance would have a potential long-range detrimental effect on the smaller banks in the area; and finally, that the application should be considered in the light of the extent to which the proposed acquisition, if consummated, would increase the existing concentration of banking resources in the large Wisconsin bank holding companies.

■ We are convinced that the facts and the reasonable inferences to be drawn therefrom support the foregoing conclusions. In this connection, it was proper for the Board to consider, as background to the facts before it, the view expressed by the Wisconsin Commissioner of Banks that, " * * * the major bank holding companies of Wisconsin are engaged in a struggle for control of our dominant independent banks and, unless stopped at this point, will ultimately lead to monopoly control of banking in the State of Wisconsin."

■ We think it is self-evident that excessive concentration of control in a few bank holding companies in a state is itself a danger to banking competition.[4] Relevant to this proposition is the statement in Northwest Bancorporation v. Board of Governors, 303 F.2d 832, 839 (8th Cir. 1962):

"We think it may not be gainsaid that concentration of control has the natural and inherent effect of lessening competition. * * * Control of all banks in one ownership would have the natural effect of lessening competition in the industry. * * * "Nevertheless, size and concentration of bank control in the area is indeed a factor which was and should have been considered by the Board in weighing the advisability of approving the acquisition and its effect upon adequate and sound banking, the public interest and the preservation of competition. Certainly the size of petitioner as well as that of bank are factors which contribute to the whole picture from which the Board had to make its determination."

The Board found that the additional banking services[5] which Beloit State would provide upon its acquisition by petitioner could only serve to strengthen its competitive position in the relevant area. Moreover, any increase of concen-

---

3. See note 2 supra for the Board's statement of the facts.

4. See S.Rep.No. 1095, 84th Cong., 1st Sess., 1 (1955):
   "It is not the Committee's contention that bank holding companies are evil of themselves. However, because of the importance of the banking system to the national economy, adequate safeguards should be provided against *undue concentration of control of banking activities.* * * *" (Emphasis added.)
   Also at 10:
   "The factors required to be taken into consideration by the Federal Reserve ▪▪ Board under this bill also require contemplation of the *prevention of undue concentration of control in the banking field* to the detriment of public interest and the encouragement of competition in banking." (Emphasis added.)

5. These include: increased lending capacity; assistance with installment loan operations, trust and investment services, and foreign banking operations; automotive facilities; a personnel training program; and availability of additional capital.

tration of control by the bank would adversely affect the competition of the smaller banks for the total banking resources and needs of the community. We think this rationale is sound and that it is based upon valid inferences drawn from undisputed facts. Accordingly, we hold that the Board's reasons for denying the application were not insufficient, as argued by petitioner; further, that the Board did not act arbitrarily or capriciously.

The Board's order is affirmed.